Our second case for this morning is Ramirez v. Young. Ms. Grady. Thank you, Your Honors, and may it please the Court. This Court has repeatedly held that it is not incumbent on a prisoner to divine the availability of grievance procedures. Instead, it is the responsibility of prison officials to ensure that the prisoner is provided with the necessary information to be able to proceed with the procedure. Mr. Ramirez, the plaintiff appellant in this case, asked this Court to apply its holding to this case and determined that administrative remedies were not available to him because he was never notified of their existence in a language he understood. The IDOC now provides Spanish-speaking prisoners with a Spanish-language manual, and they have a process in place by which they identify Spanish-speaking prisoners and refer them for a Spanish-language orientation. Had those processes been in place at Western Illinois when Mr. Ramirez entered and been applied to him, this appeal would not be before this Court today. Now, are you arguing that we know that he was never informed in Spanish or simply that there are disputed fact issues? Because there are glimmers in the record that maybe there was a Spanish-language manual, then there are other things in the record that there wasn't one until 2011, and it seems to go back and forth. So I just want to know from a procedural point of view where you think we are. Well, I think there has been no evidence adduced that Mr. Ramirez in fact received a Spanish-language manual. So you think the burden was on the institution, on the state effectively, to introduce that evidence? Correct, because had they produced that evidence, that would have established the availability of the procedure, and that was their burden to do. But I will admit that there is some evidence in the record suggesting that there may have been a Spanish-language manual in existence at Western Illinois, but plaintiffs certainly elicited a large amount of evidence that Mr. Ramirez never received one and that other prisoners in that same time frame who were also Spanish speakers and in fact requested them were not given Spanish-language manuals. And I think most importantly, the district court made no factual determinations to the contrary, and so I don't believe that this court could construe any of that evidence to make a determination that there was in fact a Spanish-language manual that Mr. Ramirez received. So it could be an open factual question, though, if we were to think a remand was necessary? Potentially, although I do think that that question was the initial ground on which the IDOC sought summary judgment. And in my view, I think that the evidence has pretty clearly established it, but I would concede that the district court made no factual findings one way or the other. So theoretically, the district court could make a factual finding on that score. But the evidence at the Pavey hearing established that the prison supplied an interpreter, a Spanish-language interpreter, the caseworker Julia Vincent, and that Mr. Ramirez had contact with her for other matters and had used her assistance in other contexts, filling out medical requests, et cetera. Yes. So he was aware that she was available to help him as an interpreter, but didn't reach out to her for this particular grievance. Well, so Mr. Ramirez did learn that Ms. Vincent was a translator and someone who, when available, could be called on to help him communicate. But up until the summer of 2013, when his cellmate informed him that there was a grievance procedure, he had no knowledge that a grievance procedure even existed. And so he had no reason to ask Ms. Vincent to help him fill out a grievance because he didn't know what that was or that there was a procedure by which he could or should or had to complain to prison staff about the issues that he was facing. In fact, the evidence shows that in the summer of 2013, when Mr. Ramirez does, in fact, learn of this process from his cellmate, Ms. Tate, he files a number of grievances with her assistance and complaining about a number of different issues. And I think that that strongly suggests that both that he had no knowledge up until that point of the existence of a grievance procedure and also that had he known that, he would have utilized that process and sought assistance from someone to use that process. So your theory draws a distinction between his knowledge of how to reach out and get medical care, as I recall, dental, and knowledge that he could actually complain about bad things that were being done to him. I mean, seeking out of service versus complaining about what the prison was doing. Yes, I think it's understandable why someone in Mr. Ramirez's position who's being, as he has alleged in his complaint, the subject of a lot of threats and assaults from other prisoners would feel comfortable telling a prisoner, I have this toothache, what should I do? Can you help me? And not feel comfortable saying to another prisoner, I'm being attacked and threatened on the basis of my conviction or because of my sexual orientation. I think there's a reasonable distinction to be made about why one would feel comfortable with one and not the other. The question is not whether he would feel comfortable asking another inmate, but whether he would feel comfortable asking the interpreter, whom he had used for other purposes before, and if that constitutes making these remedies available under the statute. So he did inform the interpreter of the assaults and threats that he had received. And in response to that information being communicated to her, she did not inform him of the existence of a grievance procedure or instruct him that he should file a grievance. He, again, did not know that there was a procedure, so he was not asking for her help to utilize that procedure, but that's because he didn't know that any such procedure had existed. The PAVI hearing established that he had reached out to Ms. Vincent about prior attacks? Yes. And at the transcript at page 31 and 32, Mr. Ramirez testified that he told Ms. Vincent about his cellmate threatening him with a shank, and that in response she did not tell him to file a grievance. There also at summary judgment in response, one of our material facts was that he explained that whole incident to Ms. Vincent, and the IDOC defendants at Record 462 stated that that statement was undisputed for purposes of summary judgment. So had Ms. Vincent said to him, you need to file a grievance, then the grievance procedure having now, Ramirez having been made aware of that procedure, I agree that he would have had a responsibility to use it and timely file his grievances. But because he was not aware of it and Ms. Vincent didn't tell him about it, it was not available to him. So do you make anything of the fact that during the original orientation when the one Spanish-speaking inmate is whispering a translation to him and is told to stop talking, for all I know, I'm not sure whether it was stop translating but stop talking, is that of any significance? Well, I think it certainly shows that Mr. Ramirez is communicating to someone who's employed to work at that orientation that he does not speak English and he's notifying them about his language issues. And are you making anything, in the state's response, they're blending language capability, in his case, I mean there's a lot of evidence that he really has very limited English, if at all, with illiteracy. And I want to know whether illiteracy forms any part of your argument or whether it's really just the linguistic issue. I think the linguistic issue is the primary issue. We have not pursued the question of what would happen had Mr. Ramirez received a Spanish language handbook but couldn't read it. I think that that's certainly a closer question. I know that the IDOC takes steps to do that for English-speaking prisoners who are illiterate. They say there is a grievance procedure. If you have questions, talk to your counselor. I think something to that effect for Spanish-speaking prisoners in Spanish would be a reasonable thing to do. But I don't think that this court needs to reach that question in this case. But, you know, you raise an interesting point, which is a broader aspect of this case I've been thinking about. In some ways, Mr. Ramirez is an easy case because Spanish is all over the country and certainly in the state prisons in Illinois. I take it it's your view that the prison needs to figure out what language each new inmate speaks, if they speak Hmong or if they speak Laotian or if they speak Mandarin or if they speak something else. They need to be told in that language. That is my position, but to be clear, the only consequence to that position is that that is what is required before the IDOC can invoke the affirmative defense of failure to exhaust and have a prisoner's case dismissed on its merits. It would be entirely reasonable to me, and I think probably the IDOC would agree, that they would decide for that one case of the Laotian prisoner. It's not worth it to undertake the cost to come up with an explanation in that person's native language in order to keep that person from entering the court on the merits and sort of waive their affirmative defense on that score. And that's all we're asking here. Either inform prisoners, Spanish-speaking prisoners in Spanish, about the grievance procedures, or don't complain when they don't use them. I think that's a simple and straightforward rule, and the IDOC is free to make whichever choice it wants. But when it hasn't informed prisoners about the grievance procedures, Spanish-speaking prisoners about the grievance procedures, or even that those procedures exist, it cannot then seek to dismiss the prisoner's claim without ever reaching its merits. I'll reserve the rest of my time for rebuttal if there are no further questions. All right. That's fine. Yes. I'm not sure how to pronounce your name. Boshiansa? Boshiansa. Boshiansa. Okay. Excuse me. May it please the court. Assistant Attorney General Linda Boshiansa on behalf of the state defendants. The PLRA makes exhaustion mandatory, and in Illinois, the very first step of the grievance procedure was for an inmate to attempt to resolve whatever his issue is with his or her counselor. But of course, as you know, our court has said that if the institution never tells the person that there's a grievance procedure, then that step is passed and we move to the merits. It certainly doesn't mean that the prisoner wins the case. It just means that there is no effectively available, that's what the Supreme Court stressed in its most recent decision, grievance procedure. Yes, Your Honor, but as a factual matter, the prison did tell Ramirez about the grievance procedure. I don't see how they did at all. I mean, he doesn't understand anything that's being said to him at this opening meeting, and the inmate who was translating is shushed. And we don't have any evidence that Vincent told him about the grievance procedure. So where does a Spanish speaker, I mean, I don't know if you've ever been in the position of being in the room where everyone is speaking a language you don't understand, but it can be, I was last week, and it can be very unsettling. I have been in that position. And, Your Honor, the thing here is that Ramirez never informed prison staff that he didn't understand what was going on during orientation. How can he, well? Your Honor, all he had to do was tell the prison official, raise his hand and tell the prison official, no hablo ingles, and everyone understands that means I don't speak English, and they would have arranged for a Spanish translator to be made available to him, and they would have conducted his orientation in Spanish. Why isn't it the prison's burden to make this information known to the inmates? I mean, you're shifting the burden in a material way, and I'm not sure that the law supports that. Your Honor, we're not. All we're saying is that the prisoner has to let the officials know that there is a language barrier. He didn't do that in this case. There's no evidence that he told any staff member that he didn't understand what was going on during orientation. No, I don't think that's right because the record has many notations from prison officials that all boil down to Mr. Ramirez doesn't speak English. They phrase it in different ways, so at least at this stage of the case, it seems to me there is quite a bit of evidence that the prison was perfectly well aware, with or without Mr. Ramirez saying no hablo ingles. Your Honor, there's evidence that he received Spanish translation at various other points, but at that critical juncture of when orientation was being conducted and when, as a factual matter, they did provide instruction on how to complete the grievance process, it's not clear that the person who was conducting the orientation understood that he didn't speak English. But the grievance procedure would have been easily usable if the next day they had sent Ms. Vincent to his cell and she had briefed him, so I don't know that there's anything magic about that orientation. As a matter of fact, he did meet with Vincent the next day. But the record doesn't show that she informed him about the grievance procedure. The record doesn't show that she was aware that he didn't understand what went on during the orientation. And we have to keep in mind that... Why would he understand if she was aware, as her notes say, that he didn't speak English? We have to keep in mind, Your Honor, that there are... No, but she knew he didn't speak English, right? Yes, she knew that he didn't speak English initially. All right, so why would you think a non-English speaker, if you had sat through a grievance procedure, conducted a Mandarin, maybe you speak Mandarin, but I don't, and then the next day, you know, somebody said, oh, she doesn't speak Mandarin, wouldn't the logical assumption be that you didn't follow what had been said? That is an assumption that one could make. Ms. Vincent obviously didn't make that assumption, nor did Mr. Ramirez do the simple thing of informing her that he had sat through these several hours of orientation, but didn't understand what was going on. He also signed an acknowledged receipt of having received the orientation manual, sat with her, and didn't ask what was contained within that manual. The evidence shows that Ramirez interacted with Vincent from September 2008 to October 2013. He had face-to-face interactions with her more than 15 times. Well, sure, and she helps him a lot. She helps him with the dental business, she helps him with other things, but we're talking about one very specific thing about the prison process, namely the duty to file a grievance if you want to complain about something. And it's an important part of the process. We all understand that. But if he doesn't know it's available and doesn't realize he should be asking about something that he doesn't know about, it's a little troubling. Your Honors, again, step one is just to tell the counselor that there is an issue that's taking place at the prison. Which he did, apparently. He did not, Your Honor. That's what your opponent says. He did not. When he was asked, this is at page 18 of the transcript, when he was asked at the payee hearing whether he sought Vincent's help regarding officers not protecting him, he said, no, no, I did not mention that to her. Then at page 46 of the transcript, he also couldn't remember telling her that he was being threatened by other prisoners. What about pages 31 and 32? That situation involves a 2011 disciplinary hearing, which is, of course, after he had been at the prison for three years and had already requested various forms of help for other issues. So in 2011, he had a disciplinary hearing, and according to Ramirez, he says that he explained that his cellmate had struck him. Had a shank. Had a shank, sure. So in other words, there are things in the records that suggest he does tell her some things, maybe some incidents he didn't tell her about. In 2011, he told her, according to his testimony, that he had been struck with a shank. But at that point, he had been at the prison for several years, and so there's nothing that would alert Vincent to the fact that he didn't know how to pursue the grievance process since he had used it many other times during his time there. No, he had not used a grievance process. He used the process for getting medical care. That's different. He had not used what's termed the official grievance process, but he knew that there was a mechanism for resolving issues at the prison. It's a different mechanism for the medical than for complaining about your cellmate having a shank. It is a different mechanism, but the point, again, is that all he had to do if he needed assistance at any point was to ask for help, and he didn't do that. The district court made a factual finding that Ramirez knew how to request help when he needed it. All he had to do was inform the officials of the issues that he faced. And again, you know, from 2008 to 2013, he addressed issues that ranged from inability to purchase items from the commissary to questions about his release date to requests for dental care with his translator. Now, don't you see a difference between those kinds of issues which don't attack the prison and a complaint about failure to protect or a complaint about, you know, guard brutality or a complaint about bad medical care? You know, you think of the kinds of things that do go through the grievance procedures. Sure. I would think there's an even stronger basis for requesting help if you are being beaten and under constant threat of attack, as he alleged in the complaint. So, yes, there is a difference. I would go the other way on that. I think he might have been afraid. But, Your Honor. But he still never told. I mean, we really don't want to get away from the main point that they never tell him, and it's your view that he had the burden to explore all of this. That's not our view. Our view is that they did, in fact, tell him. He says he didn't understand, but he didn't make prison officials aware of his lack of understanding. There's a notice required. That's part of the basis for exhaustion is putting the prison officials on notice of an issue that you're having. Does the prison make any record when new people come of the language that the new inmate speaks? He can't be the only non-English speaker in the Illinois prison system. Certainly not. Is that on somebody's record somewhere? As Your Honor sort of alluded to earlier, there is a notation that he was given a Spanish language manual. No, but I know, like, when somebody comes in, does the prison say, A, B, Mandarin, C, D, Spanish, E, F, English speaking, G, H, English speaking? Is that part of their inmate record? I don't know the answer to that specific question, but during orientation they are given paperwork to complete, and if an inmate is unable to complete his paperwork for whatever reason, that would be a hint to whoever's conducting the orientation that there's some sort of language difficulty or barrier. But he was whispering to another inmate who was helping him, so he might have been able to complete it, unbeknownst to them. That's the key, Your Honor, unbeknownst to them. The prison was never put on notice of these language barriers that he was facing. Well, I think that's where I disagree with you again, because Vincent repeatedly says he doesn't speak English. And isn't the 2011, the June 2011 incident enough notice to her that he is unaware of the grievance procedure? Because at that point she knows he's been attacked with a shank.  I'm not sure that that is enough to put her on notice of his alleged unawareness of the grievance procedure again. And, yes, Your Honor, it is a different context submitting medical requests, but given her repeated interaction with him over the course of his time there, I don't think that is enough to put her on notice. Well, why not? I mean, he's being disciplined when he was the one who was under attack. It seems to me that's a pretty big red flag that he doesn't understand that there's a means by which he can seek protection, which is to file a grievance. So he says, and, you know, of course we have to take his facts, but if he were being, again, all of this is, if he were under this constant threat of attack, which is what he claims, the very simple and logical response for any inmate to take was to tell someone. Even if he didn't know that there was a formal grievance procedure, at least informing his counselor about his issue, separate and apart from a disciplinary hearing. Well, he told the interpreter in June 2011, and she didn't give him the information to grieve that issue. His counselor was the interpreter. And so, again, this makes it even easier for him to just tell her that these are the issues that are going on with me. And, you know, there are notations in the record that, you know, her entries from January of 2011 and December of 2012 include the statement, inmate express no concerns. So we're not trying to shift the burden in any way, but we're saying that if for whatever reason someone didn't recognize at orientation that he was Spanish speaking only, all he had to do was inform the officials of his issues.  Thank you very much. Thank you, Your Honors. Mr. Unrath. Good morning. My name is Craig Unrath. I represent Cynthia Lynch. I'd just like to make a few introductory comments. Early on, the issue of burden of production came up in terms of who should, in terms of the manual, whether one was provided to him in Spanish or English or at all. My view of that is that's irrelevant because he now claims he's illiterate. So whether he received a manual or not makes no difference to this case. You also mentioned that the- Although your opponent has said that, I would say has conceded, that at a minimum we would have a different case before us if the record were very clear that he had received a Spanish language manual and now here we were, you know, years later with him not exhausting. I'd like to apply those facts to the Hernandez case. Judge Bower's decision, which I found perfectly reasonable, they never gave him any handbook. Now, the prisoner was a quadriplegic. Assume for a moment that they did give him a manual and they gave him the capability of turning the pages, but he never told the prison that he was illiterate in any language, Spanish, English, or any other. Now, does that change the decision in Hernandez? I think it does. And that's the key here is the illiteracy and the fact that he never told anyone. Now, he saw on average- The defendants are stressing the oral transmission of information largely from Vincent, and somebody might be- in fact, a lot of prisoners are illiterate, but prisons orally transmit information about the way the prison runs, whether it's from a medical point of view, whether it's from a grievance point of view, orally. They do, and as a matter of fact, this is how he- according to the record, that he understood. He met with his counselor, Julia Vincent, the day after the orientation. She tested his language skills. She speaks English to them first to find out how well they can speak. Then she speaks Spanish. All he had to do is advise her, I am illiterate, I cannot read. Well, I don't know why you're making- She does that, but then she makes a notation in the record that his English is extremely limited. So she runs that test, and she records her response. And if he had any questions, she also said that he had signed out a Spanish language manual, that there are grievance forms available in Spanish. But there are disputed facts on that. There are disputed facts on that. We can't take that as established. But the key here is that he saw counselors on average nine times per year. He met with Julia Vincent 15 times, and yet five years into his incarceration and one month before he filed his federal lawsuit, at that point he said, by the way, I'm illiterate. I can't read in English, Spanish, or any other language. And she put question marks after that. She was, how come we're finding this out now? The literacy question is just irrelevant here, because as Chief Judge Wood just said, we can't accept as established that he received a Spanish language rulebook. So this case hinges on Vincent, the counselor, and whether it's sufficient to supply an interpreter but do nothing more. It is undisputed that Spanish language grievance forms were available to every prisoner in the foyer area and the public areas. It is disputed. That's not an undisputed fact. It's quite disputed. The prisoners themselves testified that there were no Spanish language grievance forms, that there were English forms. So, you know, I'm not there. But somebody further down the line would resolve whether there were Spanish forms or not. But it's clearly a disputed fact. The law is that the unavailability can be established by omission, and this is what's established in the Hernandez decision. Where is the omission here? Your whole brief actually assumes a number of facts inappropriately in the light most favorable to the defense as opposed to the light most favorable to the opponent of the motion. And, you know, this is a mental exercise that we're all quite familiar with, and we know what it means and what it doesn't mean. But we have to assume right now that there are no Spanish language materials available to him. The Goldsmith case, I realize I'm out of time, but the Goldsmith case said that to sustain the unavailability exception, the plaintiff must show that he did all he could to avail himself of the administrative process. That shifts the burden, and I don't know that I agree with Goldsmith. However, the plaintiff has to do something. If he can't read, he has to tell someone, and he didn't do it in this case. We ask that the court affirm. Thank you. Thanks. Anything further, Ms. Grady? Just briefly, I'll just note that the Goldsmith case is a district court opinion that actually predates this court's decision in Hernandez, and I believe also Thomas against Reese, which discusses the questions of availability and clearly establishes that prisons have a responsibility to inform prisoners of the grievance process to make it available. Two other points I'd like to make. The first is that appellees discussed that Mr. Ramirez did not comply with step one of the grievance procedure, but, of course, the threshold question here is, is that grievance procedure available? And I would just like to point out that the testimony that was pointed out to your honors on page 18, I believe was represented to be Mr. Ramirez contending that he did not mention anything about needing protection from other inmates, but, in fact, the quote is, my question is whether you asked her specifically to help you write a grievance regarding officers not protecting you from other inmates. Answer, no, no, I did not mention that to her. Of course, we don't dispute that prior to the fall of 2013, he did not seek assistance from Ms. Vincent to file grievances because, as we've explained, he didn't know that any such process existed. The last point I'll just make is that the IDOC now contends, it appears that the IDOC is contending simultaneously that they had no knowledge that Mr. Ramirez spoke Spanish or faced any inability to understand, and simultaneously that they provided him with a Spanish language handbook. I don't know how those two things can actually be true at the same time. I think the evidence demonstrates that within 24 hours, Ms. Vincent met with Mr. Ramirez, suggesting that they knew almost immediately of his language barriers and that that conversation happened exclusively in Spanish because he was unable to speak English. I'll rely on my briefs for the waiver arguments that were raised. If there are no further questions, we ask this Court to reverse and remand for the Court to proceed on its merits. Thank you. All right. Thank you. Thank you to all counsel. We'll take the case under advisement. All right.